**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 1:07-CR-0174** |
| | : | |
| **v.** | : | **(Judge Conner)** |
| | : | |
| **SHAWN JACKSON** | : | |

**<u>MEMORANDUM</u>**

Presently before the court is defendant's motion to suppress (Doc. 29) all evidence seized pursuant to a warrant executed on March 5, 2007, in connection with a police investigation of defendant's brother, Randell Jackson.  The court held an evidentiary hearing on defendant's motion on August 27, 2007 and a supplemental hearing on September 7, 2007.  (<u>See</u> Docs. 44, 46.)  The motion has been fully briefed and is ripe for disposition.  For the reasons that follow, the motion will be denied.

**I.    <u>Findings of Fact</u>[1]**

On May 2, 2007, defendant, Shawn Jackson, was indicted by a grand jury. The indictment charges defendant with possession of cocaine base with the intent to distribute, conspiracy to distribute cocaine base, possession of a firearm by a convicted felon, and possession of a firearm during and in connection with a drug trafficking offense.  (Doc. 1.)  On May 22, 2007, defendant entered a plea of not guilty to each count in the indictment.  (Doc. 16.)

---

[1] These findings are based on testimonial and documentary evidence presented at the hearings on the motion.  The findings substantially reflect testimony given by the executing officers, which the court finds credible.

The allegations in the indictment are based, in large part, upon evidence seized pursuant to a search warrant from the home of defendant's mother, who resides at 2890 Forrest Lane in York, Pennsylvania. (Doc. 44 at 3.) Defendant and his brothers Darnell and Randell Jackson also reside at this residence. The impetus for the search arose when police found evidence allegedly linking Randell Jackson to drug activities after conducting a search of an apartment located at 85 Bridlewood Way in York, Pennsylvania. Because the evidence uncovered during the Bridlewood Way search affects the probable cause calculus in the instant case, the court turns first to the details of the Bridlewood Way search.

A.    **The Bridlewood Way Search**

On March 5, 2007, Detective Raymond Craul ("Detective Craul") of the Springettsbury Township Police Department met with employees of the apartment complex located at 85 Bridlewood Way. The property manager informed Detective Craul that a maintenance worker had discovered evidence of drug activity while investigating a water leak in Apartment C-42. The maintenance worker provided Detective Craul with a small portion of an off-white chunky substance that he had discovered on the apartment counter. Detective Craul conducted a field test of the substance, which tested positive for cocaine. (Doc. 29-2 at 9.) Based upon this evidence, Detective Craul applied for and was issued a search warrant for Apartment C-42 by Magisterial District Judge Harold Kessler ("Judge Kessler"). (Id. at 8.)

2

At approximately 3:17 p.m., Detective Craul and a number of other officers, including Corporal Craig Fenstermacher ("Corporal Fenstermacher") of the Pennsylvania State Police, executed the search warrant.  (Doc. 37 at 1.)  The search revealed 1.5 kilograms of cocaine and assorted drug trafficking paraphernalia.  (Id.; see also Doc. 29-2 at 10-11.)  The officers also located receipts in the name of Zunny Santiago ("Santiago"), who was later determined to be the lessee of the apartment. (Id. at 2.)  The officers noted that the apartment was sparsely furnished and contained no food or clothing items.  The officers deemed this consistent with a "stash house," meaning that "the primary reason for [the apartment's] use [was] to store the cocaine at a location away from the possessors' actual residence, thus attempting to insulate them from the cocaine."  (Id.)  At approximately 7:15 p.m., the officers observed an individual approaching Apartment C-42.  When the individual used a key to enter the apartment, he was taken into custody and identified as Randell Jackson ("Randell").  (Id.; see also Doc. 37 at 2.)

**B.    The Investigation into Randell's Residence**

Suspecting that the Bridlewood Way apartment was a "stash house," the officers attempted to ascertain where Randell resided because they believed that additional evidence might be located there.  Randell stated that he resided at 823 West King Street in York, Pennsylvania and produced a Pennsylvania identification card bearing the same address.  (Doc. 29-2 at 2.)  However, the officers visited that address and found it to be vacant.  (Id. at 3.)  The officers then asked Randell where

3

he keeps his clothing, and he responded that he keeps his things "all over." (<u>Id.</u> at

2.) Next, the officers determined that the vehicle that Randell had driven to

Bridlewood Way was registered to Randell's mother, Brenda Pinkney ("Pinkney"),

whose address was determined to be 2890 Forrest Lane in York, Pennsylvania. (<u>Id.</u>)

Through further investigation, the officers determined that Randell had provided

the Forrest Lane address as his home address to: (1) the York City Police

Department on four prior occasions, most recently in January of 2007, and (2) the

York County Court of Common Pleas in December of 2006. (<u>Id.</u>; Doc. 44 at 6.) The

officers also learned from Santiago that she and Randell had "picked up a personal

affect [sic] associated with a business they operate" from the Forrest Lane address

several days prior. (Doc. 29-2 at 3.) Based upon this evidence, Corporal

Fenstermacher applied for and was issued a search warrant for 2890 Forrest Lane

by Magisterial District Judge John R. Olwert.[2] (<u>Id.</u> at 1.)

The warrant described the premises to be searched as "2890 Forrest Lane,

Springettsbury Township, York County, PA" and stated that the residence was "a

single family home, split level style, tan brick with white siding and a two car

garage." (<u>Id.</u>) The warrant listed Randell Jackson as the owner, occupant or

---

[2] Corporal Fenstermacher testified that because he applied for the warrant at approximately 9:30 p.m, it was issued by the "on-call duty" district judge rather than by Judge Kessler, who is assigned to the district where the Forrest Lane property is located. (Doc. 47 at 6-7, 11.) Corporal Fenstermacher further clarified that the choice of district judge "wasn't even an issue" and that he "went to the district justice who contacted [him] after [he] made a request to speak to one." (<u>Id.</u> at 13.)

possessor of the premises to be searched.  (Id.)  The warrant also described the

items to be searched for and seized as:  (1) "any documentation pertaining to 85

Bridlewood Way, Apartment #C-42, York, PA, including but not limited to, lease

agreements, mail, receipts, [and] door keys to this residence," (2) "cocaine, cash,

records of drug distribution and paraphernalia associated with drug distribution,"

and (3) "any banking records in the name of Zunny Santiago or Randell Jackson."

(Id.)

C.      **The Forrest Lane Search**

The officers executed the warrant at the Forrest Lane residence at

approximately 9:50 p.m.  (Doc. 29 ¶ 4.)  Officer Christopher Keppel ("Officer

Keppel") of the Pennsylvania State Police testified that the officers knocked at the

front door of the residence, where they were met by Darnell Jackson ("Darnell").

(Doc. 47 at 18.)  The officers identified themselves to Darnell and advised that they

had a search warrant before entering the residence.  (Id. at 19.)  The officers

proceeded to search the entire residence, looking both for anyone who may pose a

threat to their safety and for the objects listed in the search warrant.  (Id.)  The

search uncovered various weapons, drugs, and drug paraphernalia.  (Doc. 29-2 at 4-

6.)

At some point during the search, Officer Keppel learned that none of the

other officers had searched the first-floor bedroom that was later discovered to

belong to defendant.  Officer Keppel testified that he "went to the door, [found that]

5

it was locked, and . . . forced into the door and cleared the bedroom." (Doc. 47 at 20.)  Inside the bedroom, officers located cocaine, packaging material, approximately $11,000 in cash, and a firearm.  (Doc. 37 at 4.)  Officer Keppel testified that he was not advised that the locked bedroom belonged to defendant until *after* he had entered the bedroom and conducted the search.[3]  (Doc. 47 at 21-23.)  Nor did Officer Keppel note anything unusual about the exterior of the room or any other aspect of the residence that would have signaled to him that the residence contained separate dwellings.  (Id. at 22.)

With Darnell's assistance, the officers contacted defendant, who was not present at the residence at the time of the search.  (Doc. 44 at 3.)  Defendant was advised of the charges against him.  When defendant turned himself over to police several hours later, he was advised of his Miranda rights before making allegedly incriminating statements.  (Doc. 37 at 4-5; Doc. 44 at 3.)

## II.   **Discussion**

Defendant proffers the following arguments in favor of suppression:  (1) that the warrant was lacking in probable cause because it failed to establish a nexus between the place to be searched and the evidence sought, and (2) that the executing officers exceeded the scope of the warrant by entering defendant's separately secured bedroom.  (Doc. 29 at 1-3.)  The court will address these issues *seriatim*.

---

[3]  Darnell's testimony confirmed that the officers did not inquire as to whom the bedroom belonged until *after* the search.  (Doc. 47 at 36-37.)

A.      **Probable Cause**

When determining whether an affidavit of probable cause is sufficient to satisfy the requirements of the Fourth Amendment, a reviewing court must "ensure that the magistrate had a substantial basis for . . . concluding that probable cause existed." Illinois v. Gates, 462 U.S. 213, 238-39 (1983) (citations omitted); see also United States v. Whitner, 219 F.3d 289, 296 (3d Cir. 2000).  In making this determination, the court must give "great deference" to the magistrate's assessment of probable cause and must consider "the most reasonable reading of the affidavit." Gates, 462 U.S. at 236; United States v. Williams, 3 F.3d 69, 72 (3d Cir. 1993).  In the action *sub judice*, defendant alleges that the warrant was not supported by probable cause because the affidavit of probable cause failed to establish a nexus between the place to be searched and the evidence sought.  The government counters that the warrant was supported by probable cause and that, in any event, the good faith exception to the Fourth Amendment's exclusionary rule applies.  See United States v. Leon, 468 U.S. 897 (1984).  The court will turn first to the nexus issue.

1.      **Nexus between Place Searched and Evidence Sought**

Defendant argues that a search warrant should not have issued because the affidavit failed to establish a nexus between the place to be searched and the evidence sought.  (Doc. 44 at 4-5.)  However, "[d]irect evidence linking the place to be searched to the crime is not required for the issuance of a search warrant." United States v. Hodge, 246 F.3d 301, 305 (3d Cir. 2001) (citations omitted).  Instead,

7

"[a] court is entitled to draw reasonable inferences about where evidence is likely to be kept, based on the nature of the evidence and the type of offense."  Id.  In drug-related cases, numerous courts of appeals have held that evidence of drug crimes is likely to be found in drug dealers' residences.  See United States v. Whitner, 219 F.3d 289, 298 (3d Cir. 2000) (citing cases in accord from the United States Courts of Appeals for the First, Second, Fourth, Sixth, Seventh, Eighth, Ninth, and District of Columbia Circuits).

In the action *sub judice*, the court finds that the affidavit provided a substantial basis for the magistrate judge's finding that there was probable cause to believe that drug-related evidence would be found in the Forrest Lane residence. The affidavit suggested that Randell was a drug dealer because Randell used a key to enter an apartment that contained large quantities of cocaine and assorted drug paraphernalia.  See United States v. Fisher, 43 F. App'x 507, 510 (3d Cir. 2002) (citing officer's observance of defendant entering apartment with a key amongst evidence that could reasonably by used to establish defendant's dominion over drugs found inside the apartment).  The affidavit also provided substantial evidence to suggest that the Forrest Lane property was Randell's residence.  First, the vehicle that Randell was driving at the time of his arrest was registered to the Forrest Lane address.  Second, Randell had reported the Forrest Lane address as his residence to the York City Police Department and the York County Court of Common Pleas on at least five prior occasions.  Third, Santiago told officers that

8

she and Randell had "picked up a personal affect [sic] associated with the business they operate" from the Forrest Lane address several days prior to his arrest. Finally, Randell provided officers with deceptive and evasive responses when asked to reveal his residence, including production of an address that was later discovered to correspond to a vacant property.  See Whitner, 219 F.3d at 298-99 (upholding search of a defendant's apartment where affidavit of probable cause suggested that the defendant was a drug dealer and disclosed a series of deceptive responses from the defendant regarding his residence).  Based on the foregoing, the court finds that the magistrate's assessment of probable cause was reasonable.

### 2.   __Good Faith Exception__

Assuming *arguendo* that no substantial basis existed from which the magistrate could have found probable cause, defendant would need to establish that the "good faith" exception to the exclusionary rule did not apply before the court could grant his motion to suppress.  The exclusionary rule was intended to deter unlawful police conduct; however, the rule had the added effect of allowing "some guilty defendants [to] go free or receive reduced sentences." Leon, 468 U.S. at 906-07.  As a result, the United States Supreme Court crafted the "good faith" exception, recognizing that law enforcement officers who act in the good faith belief that their conduct does not violate the Fourth Amendment need not be deterred. United States v. $92,422.57, 307 F.3d 137, 145 (3d Cir. 2002); see also Leon, 468 U.S. at 922-25.

To determine whether to apply the "good faith" exception, the court must ask "whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." $92,422.57, 307 F.3d at 145. The fact that a search was conducted pursuant to a warrant typically "suffices to prove that an officer conducted a search in good faith and justifies application of the good faith exception." Id. at 146. There are, however, four situations in which an officer's reliance on a warrant is not reasonable:

> (1) when the magistrate judge issued the warrant in reliance on a deliberately or recklessly false affidavit;
> (2) when the magistrate judge abandoned his judicial role and failed to perform his neutral and detached function;
> (3) when the warrant was based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; or
> (4) when the warrant was so facially deficient that it failed to particularize the place to be searched or the things to be seized.

Id. In the instant case, defendant argues that: (1) the affidavit was so lacking in indicia of probable cause that a law enforcement officer could not have reasonably believed that probable cause existed, and (2) the affidavit was deliberately or recklessly false. (Doc. 44 at 12, 16.)

As long as an affidavit of probable cause is more than a "bare bones document based on conclusory, unsupported statements," it is sufficient to overcome the first of defendant's arguments. United States v. Mortimer, No. 03-4174, 2005 WL 318650, at *4 (3d Cir. 2005). The affidavit in this case is more than a "bare bones document." In fact, the affidavit sets forth the specific circumstances

of the Bridlewood Way search and describes why the officers' training and experience led them to determine that the Bridlewood Way apartment was a "stash house." The affidavit also clearly delineates Randell's connections to Bridlewood Way and to the Forrest Lane residence. (See Doc. 29-2 at 2-3.) Accordingly, the executing officers were reasonably justified in their belief that the warrant was valid, and defendant's argument for inapplicability of the good faith exception based on an obvious lack of probable cause must fail. See United States v. Smith, 219 F. App'x 242, 245 (3d Cir. 2007) (citing United States v. Williams, 3 F.3d 69, 74 (3d Cir. 1993)).

The court turns next to the deliberately or recklessly false statements argument. Defendant asserts that the officers engaged in a concerted effort to obtain the Forrest Lane and Bridlewood Way warrants from different issuing authorities so that they could deliberately exclude certain information from the Forrest Lane affidavit. (Doc. 44 at 18-19.) Corporal Fenstermacher's testimony clearly rebuts this argument. Corporal Fenstermacher testified that he applied for the Forrest Lane search warrant at 9:30 p.m. and that, as a result, the choice of magistrate was dictated by "on-call duty" assignments. See supra note 1. Moreover, even assuming that the choice of magistrate had been deliberate, defendant has offered no evidence to suggest that the evidence that was allegedly excluded from the affidavit was "sufficiently material to defeat probable cause." United States v. Brown, 3 F.3d 673, 678 n.5 (3d Cir. 1993). Defendant suggests that

11

the officers intentionally excluded several details regarding the Bridlewood Way search from the Forrest Lane affidavit, such as the fact that a maintenance worker discovered drugs within the Bridlewood Way apartment.  (Doc. 44 at 18-19.)  The court finds the absence of these details in the Forrest Lane affidavit insufficient to defeat the magistrate's probable cause finding.  In fact, the details may have bolstered the magistrate's finding had they been included in the Forrest Lane affidavit, thus removing the impetus for their alleged intentional exclusion.  See Brown, 3 F.3d at 678 n.5; see also supra Part II.A.1.  For the foregoing reasons, the "good faith" exception insulates the search, and defendant's motion to suppress for lack of probable cause must be denied.

### B.    Exceeding Scope of Search Warrant

Defendant argues that even if the search warrant was valid, the executing officers exceeded its scope when they entered his separately locked bedroom. (Doc. 44 at 21.)  If the scope of a search "exceeds that permitted by the terms of a validly issued warrant," the subsequent seizure of the items discovered is unconstitutional.  Horton v. California, 496 U.S. 128, 140 (1990).  During a search pursuant to a warrant, executing officers are permitted to open any containers in which objects named by the warrant "may reasonably be found."  United States v. Newman, 685 F.2d 90, 92 (3d Cir. 1982).  As the United States Supreme Court has reasoned, when officers are executing a warrant, "distinctions between closets, drawers, and containers . . . must give way to the interest in the prompt and

12

efficient completion of the task at hand."  United States v. Ross, 456 U.S. 798, 821 (1982); see also Torres v. United States, 200 F.3d 179, 187 (3d Cir. 1999).  When determining whether a locked space may reasonably be opened during the course of a search pursuant to a warrant, the court's inquiry should be guided by a comparison of the dimensions of the locked space to the dimensions of the items sought in the search warrant.  Newman, 685 F.2d at 92.  In the instant case, the warrant authorized the officers to search the entire Forrest Lane residence for evidence including documents, keys, drugs, and drug paraphernalia.  (Doc. 29-2 at 1.)  Because any of these items could have been found in defendant's locked bedroom, the court finds that the executing officers did not exceed the scope of the search warrant by entering that room.

The court notes that when an executing officer knows or should know that there are separate dwellings contained in the property to be searched, he or she is "obligated to either limit the search to those areas clearly covered by the warrant or to discontinue entirely [his or her] search."  United States v. Ritter, 416 F.3d 256, 266 (3d Cir. 2005) (quoting Maryland v. Garrison, 480 U.S. 79, 87 (1987)).  The purpose of the multi-unit dwelling rule is to prevent executing officers from searching separate units of a multi-unit dwelling "upon a mere showing that one of the units, not specifically identified, contained the contraband sought."  Ritter, 416 F.3d at 267 n.9 (citing United States v. Busk, 693 F.2d 28, 31 (3d Cir. 1982)).  To hold otherwise would contravene the Fourth Amendment's particularity requirement by

expanding the area to be searched beyond that for which probable cause exists. Garrison, 480 U.S. at 84-85. However, the multi-unit dwelling rule is not applicable to the instant case because defendant has offered no evidence to suggest that the Forrest Lane residence contained separate dwellings. To the contrary, Officer Keppel testified that the residence "appeared to be just a normal one family dwelling, not a separate boarding room or separate apartment house." (Doc. 37 at 22.) Nor is there any evidence of record to suggest that the exterior of the locked bedroom bore any unusual attributes that should have signaled to Officer Keppel that the room constituted a separate dwelling. (Id.) Moreover, Officer Keppel was not advised that the locked bedroom belonged to defendant until *after* he had entered the room and conducted the search. (Id. at 21-23.) Because defendant has offered no evidence to suggest that Officer Keppel knew or should have known that the Forrest Lane property contained separate dwellings before entering defendant's locked bedroom, defendant cannot now claim the protections of the multi-unit dwelling rule.

Having deemed the multi-unit dwelling rule inapplicable, the court finds that the executing officers' entry into defendant's locked bedroom fell within the scope of the search warrant because the objects of the search warrant could reasonably have been found therein. See Horton, 496 U.S. at 140. The court will deny defendant's motion to suppress the evidence found in defendant's bedroom.

14

**III.**   **<u>Conclusion</u>**

For the foregoing reasons, defendant's motion to suppress (Doc. 29) will be

denied.  An appropriate order will issue.

     <u>S/ Christopher C. Conner</u>
     CHRISTOPHER C. CONNER
     United States District Judge

Dated:     September 20, 2007

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 1:07-CR-0174** |
| | : | |
| **v.** | : | **(Judge Conner)** |
| | : | |
| **SHAWN JACKSON** | : | |

## <u>ORDER</u>

AND NOW, this 20th day of September, 2007, upon consideration of

defendant's motion to suppress evidence (Doc. 29), and for the reasons set forth in

the accompanying memorandum, it is hereby ORDERED that the motion (Doc. 29)

is DENIED.


                                        <u>S/ Christopher C. Conner</u>
                                        CHRISTOPHER C. CONNER
                                        United States District Judge