**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 1:07-CR-0174** |
| | : | |
| **v.** | : | **(Judge Conner)** |
| | : | |
| **RANDELL JACKSON and** | : | |
| **SHAWN JACKSON** | : | |

**<u>MEMORANDUM</u>**

Presently before the court is defendants' motion to suppress (Doc. 71) all

evidence seized pursuant to a warrant executed on March 5, 2007 at Apartment C-

42 of an apartment complex located at 85 Bridlewood Way ("the Bridlewood Way

apartment").  The court held an evidentiary hearing on defendants' motion on

December 18, 2007.[1]  (<u>See</u> Doc. 83.)  The motion has been fully briefed and is ripe

for disposition.  For the reasons that follow, the motion will be denied.

---

[1] The motion to suppress (Doc. 71) was originally filed by defendant Randell
Jackson ("Randell").  Thereafter, defendant Shawn Jackson ("Shawn") untimely
sought leave to join in Randell's motion.  Despite the post-deadline filing of the
motion, the court granted Shawn's request during the evidentiary hearing on
December 18, 2007.  (<u>See</u> Docs. 82, 83.)  The court's decision to permit joinder was
premised upon a finding that the rights of Randell and Shawn are not necessarily
coextensive because Shawn has yet to establish that he bore an expectation of
privacy in the Bridlewood Way apartment.  (Supp. Hr'g Tr. at 2-4.)  The court notes
that Shawn was not physically present at the evidentiary hearing because of the
untimely nature of his motion, which was filed less than one day prior to the
scheduled time for the hearing.  This provided the court with insufficient time in
which to issue a writ of habeas corpus ad prosequendum to secure Shawn's transfer
from his location of incarceration to the hearing.  Nevertheless, the court permitted
Shawn's counsel to participate fully in the hearing, and she agreed to proceed
(without objection based upon Shawn's absence).

## I.   **Findings of Fact**[2]

On May 2, 2007, defendants Randell Jackson ("Randell") and Shawn Jackson ("Shawn") were indicted by a grand jury.  The indictment charges each defendant with possession of cocaine base with the intent to distribute, conspiracy to distribute cocaine base, possession of a firearm by a convicted felon, and possession of a firearm during and in connection with a drug trafficking offense.  (Doc. 1.)  On May 22, 2007, defendants entered pleas of not guilty to each count in the indictment.  (Docs. 15, 16.)  The allegations in the indictment are based, in large part, upon evidence seized pursuant to search warrants from two separate locations:  (1) the Bridlewood Way apartment, and (2) the home of defendants' mother, who resides at 2890 Forrest Lane in York, Pennsylvania ("the Forrest Lane residence").

The facts giving rise to these two searches are as follows.  On March 5, 2007, two Bridlewood Way employees, namely maintenance worker Keith Morgan ("Morgan") and property manager Robin Reed ("Reed"), contacted the Springettsbury Township Police Department to assert a drug complaint.  (Tr. at 7.)  Detective Raymond Craul ("Detective Craul") and a fellow officer met with Morgan and Reed and discovered that Morgan had uncovered evidence of drug activity while investigating a water leak in Apartment C-42.  (Doc. 71-2 at 2; <u>see also</u> Tr. at 7-8.)  Four days earlier, Morgan had received an emergency complaint that water was

---

[2]  These findings are based on testimonial and documentary evidence presented at the hearing on the motion.  The findings substantially reflect testimony given by Detective Raymond Craul of the Springettsbury Township Police Department, which the court finds credible.

leaking from Apartment C-42 into the apartment on the floor below.  When Morgan

entered Apartment C-42, he discovered that the toilet had malfunctioned and

overflowed.  (Tr. at 8.)  Morgan immediately contacted the apartment's lessee, Zuny

Santiago ("Santiago"), and asked her permission to turn off the apartment's water

supply.  She granted the requested permission.  (Id. at 17.)  Four days later, Morgan

reentered the apartment to repair the problem.  (Id.)  While in the apartment,

Morgan observed that it was sparsely furnished with a sofa, television, and safe.

(Doc. 71-2 at 2; see also Tr. at 12-13.)  In the kitchen, Morgan noticed several bottles

of hydrochloric acid, three bottles of fingernail polish remover, five boxes of baking

soda, pans bearing a white residue, and an off-white chunky substance spilled onto

the counter and floor.  Morgan, believing the substance to be methamphetamine

and fearing for the safety of the other residents of the apartment complex, removed

a small portion of the substance from the counter and placed it in an envelope.

Morgan provided the sample to Detective Craul, who conducted a field test and

discovered that the substance tested positive for cocaine.  (Doc. 71-2 at 2; see also

Tr. at 8, 12.)  Reed informed Detective Craul that neighbors had reported high

traffic into and out of the apartment during the late evening hours.  (Doc. 71-2 at 2.)

Based upon this evidence, Detective Craul applied for and was issued a search

warrant for Apartment C-42 by Magisterial District Judge Harold Kessler ("Judge

Kessler").  Detective Craul applied for the search warrant in person.  (Tr. at 17.)

Judge Kessler dated, time-stamped, and sealed the search warrant, but neglected to

sign it.  (Doc. 71-2 at 1.)

At approximately 3:17 p.m., Detective Craul and a number of other officers, including Corporal Craig Fenstermacher ("Corporal Fenstermacher") of the Pennsylvania State Police, executed the search warrant. (Doc. 37 at 1.) The search revealed 1.5 kilograms of cocaine and assorted drug trafficking paraphernalia. (Id.) At approximately 7:15 p.m., Randell Jackson ("Randell") used a key to enter the Bridlewood Way apartment, and he was taken into custody. (Doc. 29-2 at 2.) The officers noted that the apartment was sparsely furnished and contained no food or clothing items. The officers deemed this consistent with a "stash house," meaning that "the primary reason for [the apartment's] use [was] to store the cocaine at a location away from the possessors' actual residence, thus attempting to insulate them from the cocaine." (Id.) The officers determined Randell's residence to be 2890 Forrest Lane in York, Pennsylvania. (Id. at 2-3.) Believing that additional evidence would be located there, Corporal Fenstermacher applied for and was issued a search warrant for 2890 Forrest Lane. (Id. at 1.) The officers executed the warrant at the Forrest Lane residence at approximately 9:50 p.m, and the search uncovered various weapons, drugs, and drug paraphernalia allegedly belonging to both Shawn and Randell. (Doc. 29 ¶ 4; Doc. 29-2 at 4-6.)

## II.    Discussion

Defendants proffer the following arguments in favor of suppression: (1) that the evidence uncovered in both searches must be suppressed because the Bridlewood Way search warrant was unsigned, and (2) that the evidence uncovered in both searches must be suppressed because the Bridlewood Way employees were

acting as agents of the government when they uncovered evidence of drug activity. The court will address these issues *seriatim.*

## A.   Unsigned Search Warrant

Defendants argue that the evidence uncovered in both searches must be suppressed because the Bridlewood Way search warrant was unsigned.  The government counters that the warrant contains sufficient indicia of issuance to be valid and that, even if the warrant were invalid, the good faith exception insulates the search.  See United States v. Leon, 468 U.S. 897 (1984).  The court will turn first to the question of whether the unsigned warrant was issued.

### 1.   Indicia of Issuance

Provided that a search warrant is applied for in person, the text of neither the Fourth Amendment nor Federal Rule of Criminal Procedure 41 requires the issuing authority to sign the warrant.  See U.S. CONST. amend. IV; FED. R. CRIM. P. 41(e)(3)(D) (limiting the requirement that an issuing authority must "immediately sign the original warrant" to telephonic warrants); see also United States v. K. Pierce, 493 F. Supp. 2d 611, 640 (W.D.N.Y. 2006).  Instead, the Fourth Amendment dictates that a warrant shall not "issue" unless it is supported by probable cause. U.S. CONST. amend. IV.  Generally, an issuing authority's finding of probable cause is conveyed via his or her signature on a warrant.  However, signing a search warrant is just one of a number of methods that an issuing authority may use to signal that the warrant complies with the Fourth Amendment's probable cause

requirement.  Accord Perrin v. City of Elberton, No. 03-106, 2005 WL 1563530, at *8

(M.D. Ga. July 1, 2005) ("[W]hile an unsigned warrant may not be *per se* insufficient

under the Fourth Amendment, it must be clear to the arresting officers that the

substantive requirements of the Fourth Amendment were met – that a neutral and

detached magistrate made a finding of probable cause."); United States v. Evans,

469 F. Supp. 2d 893, 897 (D. Mont. 2007) ("Issuance serves to demonstrate that a

neutral and detached magistrate has reviewed the warrant application and affidavit

and made an independent and objective determination that probable cause exists to

justify the search.").  In the absence of a signature, "a court may consider other

evidence that the judge found probable cause and approved the warrant." Perrin,

2005 WL 1563530, at *8; see also United States v. Hondras, 296 F.3d 601, 602 (7th

Cir. 2002) (stating that issuance is "not synonymous with signing"); Evans, 469

F. Supp. 2d at 897 (stating that issuance requires that a warrant "contain some

indication that the search is officially authorized").  To hold otherwise would

elevate form over substance and allow inadvertent, procedural errors to vitiate

substantively valid warrants.  Accord United States v. Turner, 558 F.2d 46, 50 (2d

Cir. 1977) (referring to the issuing authority's responsibility to sign a search warrant

as a "purely ministerial task" and holding that the Fourth Amendment is satisfied

provided that he or she "performs the substantive tasks of determining probable

cause and authorizing the issuance of the warrant").

Accordingly, the question becomes what "other evidence" is sufficient to indicate that the issuing authority made a finding of probable cause.[3]  Other United States District Courts have suggested that the following can constitute indicia of issuance:  (1) an indication on the warrant of the date before which the search must be conducted,[4] (2) the presence of a case number indicating that the warrant has been filed, (3) the presence of the issuing authority's initials or other imprimaturs of judicial authority on the warrant, and (4) an in-person acknowledgment by the issuing authority to the affiant that probable cause has been found.  See, e.g., Evans, 469 F. Supp. 2d at 897 (holding that an unsigned warrant had not been validly issued where the first two indicia were absent); K. Pierce, 493 F. Supp. 2d at 640 (holding that an unsigned warrant had been validly issued where the affiant personally appeared before the magistrate judge who had placed his initials and the abbreviation "USMJ" for United States Magistrate Judge in three separate places on the face of the warrant); Perrin, 2005 WL 1563530, at *8 (holding that an unsigned warrant had not been validly issued where the warrant was applied for remotely and no other indicia of a probable cause finding were present).[5]

---

[3]  This appears to be an issue of first impression in the Third Circuit.

[4]  See FED. R. CRIM. P. 41(e)(2)(A) (requiring warrant to "command the officer to . . . execute the warrant within a specified time no longer than 10 days").

[5]  At least one court has suggested that the following matters do *not* qualify as indicia of issuance because reliance on either of them would constitute "after-the-fact conjecture about a magistrate's intentions":  (1) the magistrate's signature on the search warrant application and affidavit, and (2) testimony by the magistrate that he or she intended to issue the warrant.  Evans, 469 F. Supp. 2d at 897-99.

The court finds that the warrant in the instant case contains sufficient indicia of issuance to satisfy Fourth Amendment requirements.  First, the warrant, which is located in the lower third of a document entitled "Application for Search Warrant and Authorization," contains a handwritten date and time before which the search must be conducted – specifically, before "2:00 P.M. March 7, 2007."  The issuing authority also placed a checkmark in a box signifying that the warrant "shall be served as soon as practicable and shall be served only between the hours of 6AM to 10PM."  Second, the upper right-hand corner of the application contains the handwritten warrant control number 00025-07-02, which indicates that the warrant had been filed.  Third, the warrant contains various imprimaturs of judicial authority.  Specifically, the application contains two seals that were affixed by the issuing authority and are labeled "Magisterial District Judge, Commonwealth of Pennsylvania, York County District 19-2-01."  One of these seals is specifically located in the warrant portion of the application.  The issuing authority also placed a checkmark in the box indicating his title as "Magisterial District Judge" and inserted the handwritten date and time March 5, 2007 at 2:00 P.M. in a section labeled:  "Issued under my hand this ___ day of _____, ____ at ____ M."  Finally, Detective Craul applied for the search warrant in person and observed the issuing authority prepare and seal the warrant.  Because the instant warrant contains each and every indicia of issuance that has been recognized by other district courts, the court finds that the warrant complies with the strictures of the Fourth Amendment.  Defendants' motion to suppress on this ground will be denied.

8

## 2.   **Good Faith Exception**

Assuming *arguendo* that the Bridlewood Way search warrant was invalidly issued, defendants would need to establish that the "good faith" exception to the exclusionary rule did not apply before the court could grant their motion to suppress.  The Fourth Amendment exclusionary rule was intended to deter unlawful police conduct; however, the rule had the added effect of allowing "some guilty defendants [to] go free or receive reduced sentences."  <u>Leon</u>, 468 U.S. at 906-07.  As a result, the United States Supreme Court crafted the "good faith" exception, recognizing that law enforcement officers who act in the good faith belief that their conduct does not violate the Fourth Amendment need not be deterred. <u>United States v. $92,422.57</u>, 307 F.3d 137, 145 (3d Cir. 2002); <u>see also</u> <u>Leon</u>, 468 U.S. at 922-25.

To determine whether to apply the "good faith" exception, the court must ask "whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization."  <u>$92,422.57</u>, 307 F.3d at 145.  The fact that a search was conducted pursuant to a warrant typically "suffices to prove that an officer conducted a search in good faith and justifies application of the good faith exception."  <u>Id.</u> at 146.  There are, however, four situations in which an officer's reliance on a warrant is not reasonable:

(1) when the magistrate judge issued the warrant in reliance on a deliberately or recklessly false affidavit;

(2) when the magistrate judge abandoned his judicial role and failed to perform his neutral and detached function;

(3) when the warrant was based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; or

(4) when the warrant was so facially deficient that it failed to particularize the place to be searched or the things to be seized.

Id. In the instant case, defendants argue that the warrant is "facially deficient" because it is unsigned. The court disagrees.

In Massachusetts v. Sheppard, 468 U.S. 981 (1984), the United States Supreme Court refused to suppress evidence based upon a clerical error made by an issuing authority, reasoning that the purpose of the exclusionary rule is "to deter unlawful searches by police, not to punish the errors of magistrates and judges." Id. at 989-91. The Court held that the affiant took "every step that could reasonably be expected" of him by preparing an affidavit, presenting it to a neutral magistrate judge, and awaiting authorization to complete the search as requested. Id. at 989. Of particular note is the fact that the affiant knew of the errors in the warrant but was assured by the magistrate judge that they would be corrected. Thereafter, the affiant observed the magistrate make some changes before receiving the warrant. Id. In rejecting the argument that the affiant bore a duty to examine the warrant to ensure that the necessary changes had been made, the Court stated: "[W]e refuse to rule that an officer is required to disbelieve a judge who has just advised him, by word and by action, that the warrant he possesses authorizes him to conduct the search he has requested." Id. at 989-90. The Court went on to conclude that if an

10

"error of constitutional dimensions" was committed with respect to the warrant's issuance, "it was the judge, not the police officers, who made the critical mistake." Id. at 990. Accordingly, the Sheppard Court held that the good faith exception applied despite the fact that the search was conducted pursuant to a warrant that was facially deficient because it contained clerical errors.

The majority of courts have concluded that an issuing authority's failure to sign a warrant is precisely the type of clerical error contemplated by the Sheppard Court.[6] See K. Pierce, 493 F. Supp. 2d at 640 (equating a failure to sign a warrant to the mistake made by the magistrate in Sheppard and applying the good faith exception to this "apparently inadvertent error . . . made by the issuing judge and not the officers who executed the search"). In fact, the Fifth and Ninth Circuits have unequivocally opined that an officer's reliance on an unsigned search warrant is objectively reasonable and, therefore, satisfies the good faith exception. United States v. Kelley, 140 F.3d 596, 604 (5th Cir.), cert. denied, 525 U.S. 908 (1998) (holding that the good faith exception insulated a search pursuant to an unsigned and undated warrant where the issuing authority communicated in person to the affiant that a finding of probable cause had been made); United States v. Diaz-Lopez, No. 89-30270, 1990 WL 194268, at *1 (9th Cir. Dec. 6, 1990), cert. denied, 499 U.S. 969 (1991) (holding that the good faith exception insulated a search conducted pursuant to an unsigned search warrant where the affiant appeared in person

---

[6] This appears to be an issue of first impression in the Third Circuit.

before the issuing authority who signed the affidavit but not the warrant); see also

United States v. Vanaman, 12 F. App'x 222, 231 (6th Cir.), cert. denied, 534 U.S. 888

(2001) (concluding that officers' reliance on unsigned search warrant was

reasonable where officer delivered warrant to judge's residence for signature prior

to search but judge's thirty minute delay meant that signing actually occurred

shortly *after* search).  The decisions of the Fifth and Ninth Circuits rely heavily

upon the fact that each affiant applied for the warrant in person and observed the

issuing authority's actions in completing the warrant.  The hallmark of these cases

is the fact that the affiant "participated in every step of the process  – prepared a

warrant application, swore to it before the judge, answered the judge's questions,

heard the judge indicate that the warrant was approved, and received the warrant

application back from the judge."  Perrin, 2005 WL 1563530, at *9.  In such a

situation, it is objectively reasonable for the affiant to rely upon an unsigned

warrant because "the judge has clearly communicated a finding of probable cause."

Id.  The court finds the reasoning of the Fifth and Ninth Circuits to be persuasive

and will adopt it for purposes of resolving the questions presented herein.

    In the matter *sub judice*, Detective Craul testified that he had applied for

numerous search warrants in the past from various issuing authorities, including

Judge Kessler, but had never before been issued an unsigned warrant.  (Tr. at 21,

24.)  Detective Craul applied for the search warrant in person and "swore to the

warrant" while "standing before" Judge Kessler.  (Id. at 25.)  In fact, he observed

Judge Kessler complete the warrant from a location "right on the other side of the

12

counter." (Id.)  Before leaving Judge Kessler's office, Detective Craul noticed that

the document containing the warrant was signed, stamped, and sealed in various

locations, but did not notice the absence of the magistrate's signature on the

warrant itself.  (Id.)  After receiving the warrant, Craul proceeded to execute the

search and personally left a copy of the warrant at the Bridlewood Way residence.

(Id. at 23.)  He learned that the warrant was unsigned only when he was contacted

by the prosecutor's office after criminal proceedings had been initiated.  (Id. at 24.)

Based upon the aforementioned facts, the court concludes that the warrant's lack of

a signature is a clerical error within the ambit of the Sheppard rule.  The court

specifically finds that Detective Craul's reliance on the unsigned warrant was

objectively reasonable because he "participated in every step" of the issuance

process and did not learn of the warrant's deficiency until well after the search had

been conducted.  Accordingly, the good faith exception insulates the search

pursuant to the unsigned warrant.[7]

---

[7] The court notes that the United States District Court for the District of
Montana reached the opposite conclusion in United States v. Evans, 469 F. Supp. 2d
893 (D. Mont. 2007).  However, the facts in Evans are readily distinguishable from
the instant case.  In Evans, the warrant lacked not only a signature but also a date,
case number, or any other imprimatur of judicial authority.  While the affiant
applied for the warrant in person and originally believed the warrant to be signed,
he discovered the lack of signature just after completing the search.  The affiant did
not attempt to correct the deficiency *and* intentionally failed to provide a copy of the
unsigned warrant at the location of the search as required by Federal Rule of
Criminal Procedure 41(f).  Id. at 895-96; see also FED. R. CRIM. P. 41(f)(1)(C)
(requiring executing officer to "leave a copy of the warrant . . . at the place where
the officer took the property").  In contrast, Detective Craul's reliance upon the
unsigned warrant in the instant case was objectively reasonable because the
warrant contained numerous indicia of issuance and because Detective Craul did
not learn of the deficiency in the warrant until well after the search or neglect to
provide a copy of the warrant as did the executing officer in Evans.  Aside from
these factual distinctions, the court finds the Evans court's heavy reliance upon
Groh v. Ramirez, 540 U.S. 551 (2004), to be misplaced.  Groh dealt with a violation of
the Fourth Amendment particularity requirement.  In holding that the good faith
exception could not correct a warrant that transgressed this standard, the Court
stated: "Given that the particularity requirement is set forth in the text of the
Constitution, no reasonable officer could believe that a warrant that plainly did not
comply with that requirement was valid."  Id. at 560, 563.  The Court distinguished a
particularity violation from a "mere technical mistake or typographical error,"
implying that the latter is not constitutionally deficient.  Id. at 558.  Unlike the
particularity requirement, the text of the Fourth Amendment does not mandate
that a warrant be signed, making a lack of signature more akin to the technical
mistakes discussed in Sheppard and referenced in Groh.  Accordingly, the Court's
holding in Groh does not dictate the outcome of the instant case because a
reasonable officer could believe that a warrant that was sealed, dated, time-
stamped, and assigned a case number complied with the Fourth Amendment, even
absent the magistrate judge's signature.

### B.    Private or Governmental Action

Defendants contend that Morgan and Reed were acting as agents of the government when they uncovered evidence of drug activity in the Bridlewood Way apartment.  The Fourth Amendment proscribes only governmental action, United States v. Jacobsen, 466 U.S. 109, 113 (1984), and does not extend to a search or seizure "effected by a private party on his own initiative," Skinner v. Railway Labor Executives' Ass'n, 489 U.S. 602, 614 (1989).  However, the Fourth Amendment does protect against searches conducted by a private party "if the private party acted as an instrument or agent of the Government."  Id.; see also In re Bursztyn, 366 B.R. 353, 364 (Bankr. D.N.J. 2007) (quoting Jacobsen, 466 U.S. at 113-14) (holding that the Fourth Amendment is applicable to private searches or seizures effected by an individual "acting as an agent of the government or with the participation or knowledge of any governmental official").  Whether a private party is acting as an agent or instrument of the government depends "on the degree of the Government's participation in the private party's activities, a question that can only be resolved in light of all the circumstances." Skinner, 489 U.S. at 614 (internal citations and quotations omitted).  This is a fact-intensive inquiry for which the defendant bears the burden of proof.  Johnson v. United States, 971 F. Supp. 862, 867 (D.N.J. 1997); see also United States v. Cleaveland, 38 F.3d 1092, 1093 (9th Cir. 1994); United States v. Feffer, 831 F.2d 734, 739 (7th Cir. 1987).

While the Third Circuit has yet to articulate a test for use in determining an individual's private or governmental status, eight of its ten sister courts of appeals have focused the inquiry on the following factors: (1) whether the government knew of and acquiesced in the intrusive conduct, and (2) whether the party performing the search intended to assist law enforcement efforts or to further his own ends.[8] United States v. Alexander, 447 F.3d 1290, 1295 (10th Cir. 2006); United States v. Ginglen, 467 F.3d 1071, 1074 (7th Cir. 2006); United States v. Steiger, 318 F.3d 1039, 1045 (11th Cir. 2003); United States v. Young, 153 F.3d 1079, 1080 (9th Cir. 1998); United States v. Jenkins, 46 F.3d 447, 460 (5th Cir. 1995); United States v. Malbrough, 922 F.2d 458, 462 (8th Cir. 1990); see also United States v. Jarrett, 338 F.3d 339, 345 (4th Cir. 2003) (combining the two factors into "one highly pertinent consideration"); United States v. Lambert, 771 F.2d 83, 89 (6th Cir. 1985) (stating the first factor as "the police must have instigated, encouraged or participated in the search" and the second factor as "the individual must have engaged in the search with the intent of assisting the police in their investigative efforts"). Given the overwhelming consensus regarding the appropriate test to be applied to a

_____

[8] Like the Third Circuit, the Second Circuit Court of Appeals has yet to articulate a standard to be used in conducting the inquiry. See United States v. Wolfson, 160 F. App'x 95, 97 (2nd Cir. 2005) (conducting a private versus governmental actor inquiry without articulating a test). The First Circuit Court of Appeals has rejected a test-based approach and has opted instead for a consideration of the totality of the circumstances, stating that "any specific standard or test attempting to distinguish government from private action is likely to be oversimplified or too general to be of help." United States v. Momoh, 427 F.3d 137, 140-41 (1st Cir. 2005).

governmental action inquiry, the court will follow suit and apply the
aforementioned standard to the instant case.

With the applicable standard in place, the court finds that defendants have
failed to present any evidence to suggest that Morgan or Reed were acting as agents
of the government when Morgan conducted a search of the Bridlewood Way
apartment.  Turning to the first factor, the record is devoid of evidence to suggest
that the police either knew of or acquiesced in the search.  To the contrary, the
evidence suggests that Morgan entered the apartment on his own initiative after
receiving a complaint of a water leak and that Morgan had no contact with the
police until *after* the search had been completed.  (Tr. at 8-9); <u>see also</u> <u>Young</u>, 153
F.3d at 1080 (considering facts that FedEx employee opened a package "on his own
initiative" and that he did not contact the government until after the package had
been opened among items revealing lack of knowledge or acquiescence by the
government); <u>Johnson</u>, 971 F. Supp. at 867 (holding that the Fourth Amendment
did not apply where an individual "acted on his own" to procure a computer tape
and "voluntarily" provided the tape to the government).  Detective Craul's
testimony confirms the government's lack of knowledge of or acquiescence in the
search conducted by Morgan.  The detective testified that he "at no time directed
anybody at all associated with [85 Bridlewood Way] to act on [his] behalf to go
through [the Bridlewood Way] apartment or any apartment looking for controlled
substances or drugs."  (Tr. at 9.)  He also denied ever having contact with Morgan

before receiving the complaint in the instant case.  (Id.)  While Detective Craul

admitted that he had previously spoken with Reed "on occasion," he clarified that

those inquiries were unrelated to drug activities or to Randell or Santiago and were

limited to attempts to locate fugitives with last known residences at the 85

Bridlewood Way apartment complex.  (Id. at 9-10, 14-15.)  The court finds this prior,

unrelated contact with Reed insufficient to transform a privately-conducted search

into a search in which the government acquiesced.

Turning to the second factor, the evidence of record suggests that Morgan

intended to "further his own ends" when he conducted the search.  The water leak

clearly provided Morgan with a legitimate business purpose for entering Apartment

C-42.  Once inside, Morgan observed the apartment's sparse furnishings and other

indicia of drug activity before making the independent decision to remove a small

portion of a white substance from an apartment counter.  Morgan explained that his

decision was prompted by a fear that the substance was methamphetamine and

could harm the other residents of the apartment complex.  (Doc. 71-2 at 2; Tr. at 8,

12-13); see Young, 153 F.3d at 1081 (finding FedEx employee had searched package

for his own ends where he did so pursuant to a policy promulgated "to protect the

safety and security of [the company's] employees").  Assuming *arguendo* that

Morgan's impetus for the search encompassed a dual motivation to detect or

prevent crime, the court's analysis would remain unchanged.  Where the private

citizen is motivated *both* to assist the government *and* to further his or her own

18

objectives, the private citizen is not acting as an agent of the government.

Cleaveland, 38 F.3d at 1094; see also United States v. R.L. Pierce, 893 F.2d 669, 674

(5th Cir. 1990) (holding that airline employees who were acting pursuant to

company policy in conducting a search that assisted law enforcement officers were

not agents of the government); United States v. Koenig, 856 F.2d 843, 849 (7th Cir.

1988) (same).

For the foregoing reasons, the court finds that Morgan conducted the search

as a private actor and that the Fourth Amendment does not proscribe or limit his

conduct.  Accordingly, the defendants' motion to suppress will be denied with

respect to this claim.

**III.   <u>Conclusion</u>**

Given the court's conclusions that the Bridlewood Way search warrant was

constitutionally issued and that the Bridlewood Way employees were not acting as

agents of the government, defendants' motion to suppress (Doc. 71) will be denied.

An appropriate order will issue.


                                         S/ Christopher C. Conner
                                        CHRISTOPHER C. CONNER
                                        United States District Judge


Dated:        January 17, 2008

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | **CRIMINAL NO. 1:07-CR-0174** |
| | **:** | |
| **v.** | **:** | **(Judge Conner)** |
| | **:** | |
| **RANDELL JACKSON and** | **:** | |
| **SHAWN JACKSON** | **:** | |

### ORDER

AND NOW, this 17th day of January, 2008, upon consideration of defendants'

motion to suppress evidence (Doc. 71), and for the reasons set forth in the

accompanying memorandum, it is hereby ORDERED that the motion (Doc. 71) is

DENIED.

   S/ Christopher C. Conner
CHRISTOPHER C. CONNER
United States District Judge